## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Jeffery Z.,<br><br>                    Plaintiff,<br><br>v.<br><br>Kilolo Kijakazi, Acting Commissioner of<br>Social Security,<br><br>                    Defendant. | Civil No. 3:21-cv-01458-MPS<br><br><br><br>February 21, 2023 |

## RECOMMENDED RULING ON PENDING MOTIONS

### I.    INTRODUCTION

This is a Social Security case arising out of the Plaintiff, Jeffery Z.'s,[1] claim for disability insurance benefits.  The Plaintiff suffers from mental, orthopedic, hepatic, endocrine, and hematological disorders.  When he applied for benefits in 2018, he initially identified only the first four as preventing him from working, but in 2020 he developed an additional blood disorder.  He updated his claim file, and by the time of his hearing before an Administrative Law Judge ("ALJ"), his blood disorders were among his principal complaints.  When the ALJ asked him why he could not work, the very first thing he cited was anemia-induced fatigue.  (R. 60.)  His doctor, a specialist in hematology at the Yale University School of Medicine, opined that his fatigue would significantly limit the number of hours that he could stand or walk in a workday.  (R. 5489.)

The ALJ nevertheless held, at Step Two of the five-step sequential evaluation process, that the Plaintiff's blood disorder was "non-severe."  (R. 15.)  He discounted the Yale doctor's opinion

---

[1]    Pursuant to the Court's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "the Plaintiff," throughout this opinion.  *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

as "not persuasive" and, after doing so, found "no support in the evidence of record that the claimant has significant limitations in terms of his ability to perform basic work activities secondary to these impairments." (*Id.*)  He also concluded that "[t]he conditions are well managed though [sic] conservative treatment." (*Id.*)

The Plaintiff argues that this was error (Pl.'s Mem. of L. in Supp. of Mot. to Reverse, ECF No. 14-2, at 1-6) ("Pl.'s Memo."), and I agree.  As discussed in Section IV.A below, the ALJ did not properly apply the SSA regulations for considering – or for articulating consideration of – the Yale specialist's opinion.  And with that opinion entirely discounted, the ALJ lacked a substantial evidentiary basis for concluding that these impairments were non-severe, because there was no other evidence in the record with which he could assess their impact on the Plaintiff's ability to perform basic work activities.

To be sure, many Step Two errors are harmless.  When an ALJ finds at least one impairment to be severe, "the question whether the ALJ characterized any other alleged impairment as severe or not severe" is typically "of little consequence." *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013) (citation and quotation marks omitted).  This is because "[u]nder the regulations, once the ALJ determines that a claimant has at least one severe impairment," he is obliged to "consider all impairments, severe and non-severe, in the remaining steps" of the sequential evaluation process. *Edgardo R. v. Saul*, No. 3:19-cv-1874 (SDV), 2021 WL 4472720, at *8 (D. Conn. Sept. 30, 2021) (quoting *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003)).  Here, however, the ALJ did not meaningfully consider the impairments at the later steps.  (*See* discussion, Section IV.A *infra.*)

I therefore recommend that the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 14) be granted in part and denied in part.  It should be granted to the

extent that it seeks an order remanding the case to the Commissioner for a new hearing but denied to the extent that it seeks reversal and remand solely for a calculation of benefits. The latter form of relief is proper only when the record contains "persuasive proof" of the claimant's disability and "a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). That is not the case here. (*See* discussion, Section V *infra.*) I also recommend that the Defendant's Motion for an Order Affirming the Commissioner's Decision (ECF No. 19) be denied.

The Plaintiff makes other claims of error. (Pl.'s Memo., at 7-23.) The foregoing recommended disposition, if adopted, would result in a rehearing and thus have the practical effect of mooting those other claims. I will nonetheless address them in Section IV.B below, for the guidance of the parties and the ALJ on remand and for the assistance of the District Judge.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act on October 2, 2018. (R. 12, 199.) He claimed that he could not work due to anxiety, depression, liver disease, type II diabetes, Osgood-Schlatter disease[2] in his left knee, bulging spinal discs at L3 and L4, and a pinched nerve in his back. (R. 12, 15; *see also* R. 117, 236.) He alleged a disability onset date of June 30, 2018. (R. 201.)

Although he did not cite them in his initial application, the Plaintiff suffers from several blood disorders. In 2016 his doctors diagnosed him with thrombocytopenia, a disorder characterized by a low blood platelet count. Nat'l Heart, Lung & Blood Inst., *Thrombocytopenia*,

---

[2]     Osgood-Schlatter disease is "a painful swelling of the bump on the upper part of the shinbone, just below the knee." *Osgood-Schlatter disease*, MedlinePlus, http://medlineplus.gov/ency/article/001258.htm (last viewed Feb. 16, 2023). It is "thought to be caused by small injuries to the knee area from overuse before the knee is finished growing." *Id.*

nhlbi.nih.gov/health/thrombocytopenia (last viewed Feb. 16, 2023).  Thrombocytopenia can cause "[b]leeding that lasts a long time, even from small injuries," and '[n]osebleeds or bleeding from your gums." *Id.*  By 2020, the Plaintiff's thrombocytopenia had become pancytopenia; that is, he had a low count not only of his blood platelets, but of his red and white blood cells as well.  (R. 112); Nat'l Cancer Inst., *Pancytopenia*, https://www.cancer.gov/publications/dictionaries/cancer-terms/def/pancytopenia (last viewed Feb. 16, 2023) (defining pancytopenia as "[a] condition in which there is a lower-than-normal number of red and white blood cells and platelets in the blood").  The Plaintiff also suffers from splenomegaly, an enlargement of the spleen that can be caused by liver disease and that can produce thrombocytopenia.  Cleveland Clinic, *Hypersplenism,* my.clevelandclinic.org/health/diseases/24339-hypersplenism (last visited Feb. 16, 2023).  Although he does not have cancer, the Plaintiff treated with a specialist in hematology and oncology at Yale University's Smilow Cancer Center, Dr. Ashita Talsania, ostensibly because of the similarity between his hematological conditions and those experienced by cancer patients.  (R. 2826); Yale Univ. Sch. of Med., *Ashita Talsania*, https://medicine.yale.edu/profile/ashita-talsania/ (last viewed Feb. 16, 2023).

The Social Security Administration ("SSA") denied the Plaintiff's claim on October 9, 2019.  (R. 72-87.)  In the mental portion of its disability analysis, a psychologist named Kelly Rogers noted the Plaintiff's anxiety and depressive disorders but concluded that they were "not severe in [their] functional impact."  (R. 81-82.)  In the medical portion, Dr. Keith Kaplan determined that the Plaintiff's degenerative disc disease and obesity were severe impairments.  (R. 81.)  Because much of the information about the Plaintiff's blood disorders had yet to come into the record – and, presumably, also because the Plaintiff had not yet claimed that those disorders were disabling – Dr. Kaplan did not discuss them extensively in his determination.  After reviewing

the medical evidence of record, the SSA concluded that the Plaintiff's mental and orthopedic conditions "result[ed] in some limitations in [the Plaintiff's] ability to perform work related activities[,]" but that he could "adjust to other work." (R. 86.) It therefore determined that he was "not disabled." (*Id.*)

The Plaintiff timely requested reconsideration (R. 104, 124), and while he was awaiting that review, his doctors scheduled him for knee surgery. (R. 3598.) In preparation for the procedure, they ordered a full blood work-up. (*Id.*) The tests revealed a platelet count so low that the surgery had to be canceled. (*Id.*) They also revealed an "iron deficiency anemia of unclear etiology." (R. 5509.) In attempting to assess the potential cause of this anemia, his doctor observed that his "liver disease can account for his pancytopenia but does not particularly account for low iron." (*Id.*)

Shortly after this diagnosis, the SSA denied the Plaintiff's claim at the reconsideration level. (R. 114.) This time, the agency concluded that his depressive and anxiety disorders were severe impairments, but an agency psychologist named John J. Warren opined that "claimant retains the capacity to perform basic tasks and relate with others well enough for routine workplace purposes." (R. 108-09.) In the medical portion of the evaluation, a physician named Ricardo Ramirez opined that the Plaintiff had more limitations than Dr. Kaplan had observed. (R. 112) ("After reviewing the initial and new evidence, further restrictions were supported[.]"). Like Dr. Kaplan, Dr. Ramirez did not extensively discuss the Plaintiff's blood disorders, perhaps because some of the information still had not made it into the record. In any event, the reconsideration examiner concluded that the Plaintiff could "adjust to other work" even with the additional limitations observed by Dr. Ramirez. (R. 114.) The Plaintiff disagreed, and timely requested a hearing before an ALJ. (R. 135-36.)

Between the reconsideration decision and the hearing, the Plaintiff's doctors tried without success to determine the cause of his anemia. His gastroenterologist, Dr. Howard Regenbogen, initially suspected bleeding in the upper gastrointestinal tract, and he ordered an upper GI endoscopic exam. (R. 5246.) When that exam revealed "no overt bleeding" (R. 5515), his colleague, Dr. Michael Selden, recommended a capsule endoscopy that would study the lower as well as the upper GI tract. (R. 5521.) That second exam uncovered "blood . . . in [the] distal small bowel," but "detected" "no lesion." (*Id.*) In the last progress note in the record, Dr. Selden wrote that "we clearly do not know [the] source of [the] blood and [the] location of the potential bleeding." (*Id*.)

Between the reconsideration decision and the hearing, the Plaintiff also updated his DIB claim. He informed the SSA that he had been treating with Drs. Talsania and Regenbogen, and he explained that the two doctors were "trying to figure out why [he was] anemic." (R. 320.) He provided the SSA with updated records from Dr. Regenbogen (R. 5502-44), and he supplied the agency with medical source statements from both Dr. Regenbogen and Dr. Talsania. (R. 38, 5487-98.)

In her medical source statement, Dr. Talsania opined that the Plaintiff was significantly limited by fatigue. (R. 5488-92.) She stated that he could not walk one city block or more without rest, and that he could not climb steps at a reasonable pace without the use of a handrail. (R. 5489.) She added that he would need to "lie down and/or recline" for "[a]bout 4 hours" "during an 8-hour work day[,]" because of "[f]atigue." (*Id.*) The doctor opined that the Plaintiff would be "unable to perform work and/or [need to be] away from the work environment" "[m]ore than 30%" of each eight-hour work day[,]" and would need to be absent from work five or more days each month. (R. 5492.)

6

The ALJ held a hearing on March 17, 2021, and he asked the Plaintiff to state in his "own words what is preventing [him] from being able to do any kind of work on a full-time basis." (R. 60.) The Plaintiff cited several reasons in response, the first of which was anemia-induced fatigue. He explained that he had been working as a school bus driver, but "when [he] got diagnosed with the anemia and stuff, [he] was falling asleep at the wheel." (*Id.*) The ALJ then heard testimony from a vocational expert ("VE"), Raymond Cestar. (R. 64.) In response to one of the ALJ's hypotheticals, Cestar testified that there was work in the national economy that the Plaintiff could perform. (R. 64-65.) But he also testified that persons whose limitations required them to be off task more than ten percent of the time, or to miss work more than two days a month, could not be "gainfully employed." (R. 67.)

On April 16, 2021, the ALJ issued an unfavorable decision. (R. 9-33.) ALJs are required to follow a five-step sequential evaluation process in adjudicating Social Security claims (*see* discussion, Section III *infra*), and the written decision followed that format. Beginning with Step One, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since his claimed disability onset date of June 30, 2018. (R. 14.)

At Step Two, the ALJ found that the Plaintiff suffered from the severe impairments of obesity, degenerative disc disease of the lumbar spine, Osgood Schlatter disease of the left knee, social anxiety disorder, and major depressive disorder. (R. 15.) The ALJ then found the following medically determinable impairments to be "non severe:" nonalcoholic steatohepatitis,[3] diabetes, hypertension, hyperlipidemia, plantar fasciitis, urogenital candidiasis, gross hematuria status post

---

[3]     "Nonalcoholic steatohepatitis" is a kind of nonalcoholic fatty liver disease, "in which you have inflammation and liver cell damage, as well as fat in your liver. Inflammation and liver cell damage can cause fibrosis, or scarring, of the liver." *Fatty Liver Disease*, MedlinePlus, http://medlineplus.gov/fattyliverdisease.html (last visited Feb. 16, 2023).

cystoscopy, and iron deficiency anemia. (*Id.*) The ALJ observed "no support in the evidence of record that the claimant has significant limitations in terms of his ability to perform basic work activities secondary to these impairments[,]" and found that these conditions are "well managed through conservative treatment." (*Id.*)

At Step Three, the ALJ concluded that the Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15.) He considered and rejected Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)), 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), and 1.18 (abnormality of a major joint(s) in any extremity). (R. 15-17.) He considered whether the "Paragraph D" criteria had been satisfied, and he concluded that they had not. (*Id.*) The ALJ also considered the combined effect of obesity with other impairments but found that "the record does not contain an indication that the cumulative effect of the [Plaintiff's] obesity significantly affects [his] other impairments as to meet or medically equal a listing." (R. 17.) Lastly, the ALJ considered and rejected Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). (R. 17-19.) He considered whether the "Paragraph B" and "Paragraph C" criteria had been satisfied, and he concluded that they had not. (R. 18-19.)

The ALJ then determined that, notwithstanding his impairments, the Plaintiff retained the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 416.967(b) except that the claimant can stand and walk for four hours and sit for six hours in an eight hour day. The claimant can occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds, and can occasionally balance, stoop, kneel, crouch, and crawl. The claimant must avoid hazards such as heights and moving machinery and is able to perform simple routine tasks and have incidental contact with the public.

(R. 19.)  In reaching this conclusion, he addressed opinion evidence from four treatment providers – Dr. Bhavesh Patel; Physician Assistant Tia Williams; the Plaintiff's primary care provider, APRN Melanie Mollica (*see* R. 320); and Dr. Talsania.  (R. 22-23.)  He also addressed evidence from two consultative examiners, Dr. Steven Weisman and Wendy Underhill, Ph.D.; the analyses from Drs. Kaplan and Ramirez; and a note from an unnamed "safety supervisor" at the Plaintiff's former employer.  (R. 22-24.)  He assigned varying levels of persuasiveness to these pieces of evidence, as will be discussed below.  (*Id.*)

At Step Four, the ALJ found that the Plaintiff was incapable of performing his past relevant work as a school bus driver.  (R. 25.)  He therefore proceeded to Step Five and relied on the VE's testimony to find that there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform, including document preparer, paper press cutter, and surveillance system monitor.  (R. 26.)  Accordingly, the ALJ determined that the Plaintiff was not disabled from the date of his application through the date of his ruling.  (*Id.*)  On October 8, 2021, the Appeals Council denied the Plaintiff's request for review.  (R. 1-5.)

The Plaintiff then filed this action.  (Compl., ECF No. 1.)  The Commissioner appeared and denied the allegations of the complaint by filing the 5,582-page Certified Administrative Record.  (ECF Nos. 10, 10-1; *see also* Standing Scheduling Order, ECF No. 5, at 2 (stating that, in the District of Connecticut, the filing of administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint")).  The Plaintiff then filed his motion for an order reversing the Commissioner's decision (ECF No. 14), and the Commissioner moved for an order affirming that decision.  (ECF No. 19.)  The Plaintiff did not file a reply brief, and briefing therefore closed.  The parties' motions are ripe for decision.

### III.    APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).    To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)).    At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments." *Id.*    At Step Three, the ALJ then evaluates whether the claimant's disability "meets or equals the severity" of one of the "Listings" – that is, the specified impairments listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.*    At Step Four, the ALJ uses an RFC assessment to determine whether the claimant can perform any of his "past relevant work." *Id*.    And at Step Five, the ALJ considers "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.*    The claimant bears the burden of proving his case at Steps One through Four. *Id.*    At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).    Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal

error.  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted).  When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. In other words, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if he has made a material legal error.  Put differently, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## IV.     DISCUSSION

The Plaintiff raises five principal claims of error.  First, he contends that the ALJ's Step Two findings are unsupported.  (Pl.'s Memo., at 1.)  Second, he claims that the ALJ's evaluation of the opinion evidence is flawed.  (*Id.*, at 7.)  Third, he argues that the ALJ's evaluation of his chronic pain is insufficient.  (*Id.*, at 13.)  Fourth, he contends that the ALJ's Step Five findings are unsupported.  (*Id.*, at 15.)  Fifth and finally, he claims that the ALJ was not constitutionally appointed.  (*Id.*, at 21.)  The Court will address each argument in turn.

### A.     The Plaintiff's Challenges to the ALJ's Analysis at Step Two

The Plaintiff begins by challenging the Step Two finding that several of his impairments were "non-severe."  (Pl.'s Memo., at 1.)  As noted above, the ALJ found the Plaintiff's "medically determinable impairments of nonalcoholic steatohepatitis, diabetes melitis [sic], hypertension, hyperlipidemia, plantar fasciitis, urogenital candidiasis, gross hematuria status post cystoscopy, and iron deficiency anemia" to be non-severe.  (R. 15.)  The ALJ found "no support in the evidence of record that the claimant has significant limitations in terms of his ability to perform basic work activities secondary to these impairments."  (*Id.*)  He also stated that "[t]he conditions are well managed though [sic] conservative treatment."  (*Id.*)  He therefore found "these impairments [to be] non-severe under the Commissioner's regulations[,]" but he nonetheless claimed to have "considered all of the claimant's impairments in formulating his residual functional capacity[.]" (*Id.*)

In attacking these conclusions, the Plaintiff focuses on his blood disorders, including iron deficiency anemia.  (*Id.*, at 2-3.)  He does not contend that the ALJ erred in finding his other conditions – plantar fasciitis, urogenital candidiasis, and so forth – to be non-severe.  (*See generally id.*)  But he says that the failure to regard his hematology-related impairments as severe was "prejudicial to an uncommon degree."  (*Id.*, at 1.)  He notes that Dr. Talsania opined that he was

severely limited by anemia-induced fatigue, to a degree that VE Cestar said would disable him from all employment. (*Id.*, at 2-3.) The Commissioner disagrees and contends that the ALJ properly evaluated the Plaintiff's impairments at Step Two. (Def.'s Mem. in Supp. of Mot. for an Order Affirming Comm'r's Decision, ECF No. 19-1, at 4) ("Def.'s Memo.").

The legal principles governing Step Two disputes are well settled. At that step, the ALJ must determine whether the claimant has a severe, medically determinable impairment that has lasted or is expected to last for at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii). The SSA's regulations do not define the term "severe impairment," but instead define "non-severe impairment." *Dawn Lyn C. v. Kijakazi*, No. 3:20-cv-545 (TOF), 2021 WL 4398372, at *4 (D. Conn. Sept. 27, 2021) (quoting *Larkin v. Astrue*, No. 3:12-cv-35 (WIG), 2013 WL 4647243, at *5 (D. Conn. Apr. 29, 2013), *report and recommendation adopted in part, rejected in part*, 2013 WL 4647229 (D. Conn. Aug. 29, 2013)). "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 416.922(a); *see also* Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). By implication, therefore, a "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work." *Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order).

In arguing over whether this standard has been met, the Plaintiff and the Commissioner principally dispute whether the ALJ was within his rights to discredit Dr. Talsania's opinion. The ALJ regarded the opinion as "not persuasive" because it was "not consistent with the claimant's activities of daily living" or "the claimant's medical records." (R. 23-24.) Although Dr. Talsania is an oncologist, and although she opined that the Plaintiff was physically limited by physical manifestations of physical conditions – fatigue and diarrhea from pancytopenia, iron deficiency,

thrombocytopenia, and splenomegaly (R. 5488) – the ALJ evaluated her opinion principally in mental health terms. For example, he regarded the opinion as inconsistent with the Plaintiff's activities of daily living because the Plaintiff had the attention and concentration to "pay bills, count change, handle a savings account, and use a checkbook or money order[,]" and because he "was alert and oriented to person, place, and situation" and his "[t]hought content was appropriate." (R. 23.) The ALJ likewise regarded the opinion as inconsistent "with the claimant's medical records" because those records showed that he "had an appropriate appearance and dress, was cooperative, showed normal behavior, and normal speech[.]" (*Id.*) The Plaintiff argues that the ALJ erred in disregarding an opinion about physical impairments principally on mental health grounds. (Pl.'s Memo., at 4) ("The suggestion that being 'alert and oriented to person, place and situation' . . . has anything to do with hematological-based fatigue is specious."). The Commissioner's response mirrors the ALJ's analysis; she says that the doctor's opinion "conflicted with other evidence, including other examiners' findings" that the "Plaintiff was alert and oriented, with intact insight and judgment." (Def.'s Mem., at 5-6.)

This dispute likewise implicates established principles. For claims like the Plaintiff's, that were filed after March 27, 2017, the SSA is no longer obliged to give "any specific evidentiary weight, including controlling weight," to treating physician opinions. 20 C.F.R. § 416.920c(a). ALJs must, however, "articulate . . . how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings in [the] case record," considering (1) the opinion's supportability, (2) the opinion's consistency, (3) the source's relationship with the claimant, (4) the source's specialization, and (5) other factors, such as the source's "familiarity with other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." 20 C.F.R. § 416.920c(b), (c). The ALJ must explicitly articulate how

he considered the supportability and consistency of the medical opinion. *See* 20 C.F.R. § 416.920c(b)(2). The ALJ may, but is not required to, explain how he considered the other factors. *Id.* When considering "supportability," ALJs are directed to look to "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)[.]" 20 C.F.R. § 416.920c(c)(1). The "consistency" factor goes to the opinion's consistency with other evidence in the record. "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2). Like any other ALJ determination, the supportability and consistency determinations must be based on substantial evidence. *See, e.g., Deshotel v. Berryhill*, 313 F. Supp. 3d 432, 434 (W.D.N.Y. 2018) (citing *Tankisi v. Comm'r*, 521 F. App'x 29 (2d Cir. 2013)).

Although these standards are deferential, I conclude that they have not been met in this case. To begin with, the ALJ did not discuss the supportability of Dr. Talsania's opinion. "Discussing supportability requires an ALJ to 'compare the medical source's opinion to his own objective medical evidence,'" *Joseph L. v. Kijakazi*, No. 3:22-cv-183 (TOF), 2023 WL 1432630, at *4 (D. Conn. Feb. 1, 2023) (quoting *Coleman v. Kijakazi*, No. 3:20-cv-1588 (VLB), 2022 WL 766127, at *8 (D. Conn. Mar. 14, 2022)) (internal quotation marks and brackets omitted), and in this case, the ALJ did not make that comparison. (R. 23-24.) Dr. Talsania's progress notes were in the record (R. 3763-88), but there is no mention – let alone analysis – of them in the ALJ's written decision. (R. 23-24.) With respect to consistency, the Commissioner provides no genuine authority for the proposition that mental health criteria like orientation and normal behavior supply a substantial evidentiary basis for discrediting an opinion that a claimant is physically limited by

15

physical conditions.  (*See* Def.'s Mem., at 6.)  And although the ALJ is not required to articulate in writing how he considered the opining doctor's specialty, 20 C.F.R. § 920c(b)(2), in this case there is no evidence that he considered it at all.  Indeed, a reader of the opinion could easily conclude that the ALJ mistakenly thought Dr. Talsania was a psychiatrist, not a specialist in hematology and oncology.  (*See* R. 23-24) (identifying Dr. Talsania only as "the claimant's treating provider" and discussing her opinion in mental health terms).

Moreover, even if it had been proper to discount Dr. Talsania's opinion, that would not end the analysis; the Court would still have to consider whether there was a substantial evidentiary basis for the determination that the impairments arising from the Plaintiff's blood disorders were non-severe.  *See, e.g., Latta v. Comm'r of Soc. Sec.*, No. 6:19-cv-6439, 2020 WL 4904948, at *2 (W.D.N.Y. Aug. 20, 2020) ("An ALJ's decision at step two that an impairment is not severe must be 'supported by substantial evidence in the record as a whole.'") (quoting *Veino*, 312 F.3d at 586) (internal quotation marks omitted)).  ALJs may sometimes make this assessment without medical opinion evidence, or after rejecting all the opinions in the record, but the record must "otherwise contain[] sufficient evidence" to do so.  *See, e.g.*, *Borrero v. Saul*, No. 3:19-cv-1306 (TOF), 2020 WL 7021675, at *6, 8-11 (D. Conn. Nov. 30, 2020).  While medical source statements are not required in all cases, *see Tankisi*, 521 F. App'x at 33-34, they are when the record otherwise contains no "insight into how [the claimant's] impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life." *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (summary order).  In *Robles v. Saul*, for example, the court remanded a case in which an ALJ had determined a plaintiff's heart condition to be non-severe without the benefit of opinion evidence, because while the record did "contain information on the diagnosis and treatment of the Plaintiff's cardiac ailments, it [did] not contain any information on how those

ailments affect[ed] his ability to work."  No. 3:19-cv-1329 (TOF), 2020 WL 5405877, at *1 (D. Conn. Sept. 9, 2020).  "Without such information, the ALJ had an insufficient basis for concluding that the ailments were 'non-severe[.]'"  *Id.*

In this case, the ALJ entirely rejected the only opinion on the functional impacts of the Plaintiff's anemia and other blood disorders.  (R. 23-24) (rejecting Dr. Talsania's opinion as "not persuasive").  Dr. Regenbogen provided a "physical capacity statement," but he expressly declined to opine on the Plaintiff's functional abilities.  (R. 5494-98.)  The Court has reviewed the entire, 5,582-page administrative record to see whether there is other, non-opinion evidence that might fill the gap, but there is not.  Without having such information, the ALJ had an insufficient basis for concluding that the Plaintiff's anemia was "non-severe."  "[W]here the record contains raw medical data and/or bare medical findings but does not assess Plaintiff's functional abilities to do work related activities remand is warranted."  *Robles*, 2020 WL 5405877, at *1 (citing *Hernandez v. Saul*, No. 3:19-cv-1033 (WIG), 2020 WL 3286954, at *4 (D. Conn. June 18, 2020)) (internal quotation marks omitted).

Further, there is no substantial evidence supporting the ALJ's finding that the Plaintiff's anemia and other blood disorders were "well managed though [sic] conservative treatment."  (*See* R. 15.)  To be sure, his gastroenterologist's notes do say that his red blood cell count was improving on oral iron therapy.  (R. 5521 ("FE deficiency anemia improved on oral iron therapy").)  But there is nothing elaborating on the degree of improvement or its effect on the Plaintiff's fatigue or other functional limitations.  Moreover, the ALJ did not cite these notes in his decision (R. 15), so they do not appear to have been a basis for his conclusion.  And while an "ALJ is entitled to rely on a plaintiff's improvement in her symptoms when determining a plaintiff's RFC," *Cassandra G. v. Comm'r of Soc. Sec.*, No. 5:21-cv-576, 2022 WL 4091084, at *13 (N.D.N.Y. Sept. 6, 2022), it is

well established that a bare notation of "improvement," without more, does not supply a substantial evidentiary basis for conclusions about a claimant's vocational abilities. *Cf., e.g.*, *Martinez v. Saul*, No. 3:19-cv-1017 (TOF), 2020 WL 6440950, at *11 (D. Conn. Nov. 3, 2020) ("[T]he fact that the claimant's condition 'improved' in some measure is not, on its own, a 'good reason' for discounting her treating physician's opinion about her limitations.").

Of course, an ALJ's finding that an impairment is not severe at Step Two is harmless error when he finds other severe impairments and continues with the sequential evaluation. *Jones-Reid*, 934 F. Supp. 2d at 402. To find that the error was harmless, however, the Court must also conclude that the ALJ "specifically considered all severe and non-severe impairments during subsequent steps of the process." *Santiago v. Saul*, No. 3:19-cv-1026 (MPS), 2020 WL 5511651, at *2 (D. Conn. Sept. 14, 2020) (citing *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013)). In *Sheila Renee H. v. Kijakazi*, for example, an ALJ failed to identify the plaintiff's claimed "major depression" as a severe impairment. No. 3:21-cv-944 (TOF), 2022 WL 4181723, at *9 (D. Conn. Sept. 13, 2022). The Court nevertheless affirmed the decision because "the ALJ considered the Plaintiff's depressive disorder and her consequent limitations at the subsequent steps in the five-step evaluation process." *Id.*

In this case, by contrast, the record reveals no substantive consideration of the Plaintiff's hematology-related limitations at the subsequent steps of the sequential evaluation process. In particular, there is no meaningful discussion of anemia-induced fatigue in the RFC portion of the ALJ's opinion, even though this was the very first symptom that the Plaintiff cited when asked why he could not work. (R. 19-21, 60.) While the ALJ did state that he did not fully credit the Plaintiff's claims about the intensity, persistence, and limiting effects of his symptoms, the ensuing discussion makes clear that this was a reference to the Plaintiff's claims about difficulties in lifting,

squatting, bending, concentrating, *etc*. (R. 24.) There is no reference in that discussion to fatigue or its limiting effects. (*Id.*) And the activities of daily living that the ALJ cited in support of that credibility assessment – "operat[ing] a recreational vehicle," "perform[ing] household chores like laundry and dishes," and so forth – were likewise cited in connection with orthopedic and mental conditions; and in any event, they do not meaningfully address the question of the degree to which the Plaintiff's anemia-induced fatigue would impact an eight-hour workday. As the Plaintiff points out, the fact that he "is capable of hitching a recreational vehicle to a motor vehicle and towing it to a campsite . . . says precisely nothing about his fatigue" over the course of an eight-hour workday. (Pl.'s Memo., at 4.)

Indeed, the Commissioner evidently does not dispute this point. Nowhere in her brief does she say that, if the ALJ erred at Step Two, that error would have been harmless. (*See* Def.'s Memo., at 4-7.) While she notes that the ALJ "proceeded to the next step of the sequential evaluation" (*id.*, at 5), she cites no portion of his decision demonstrating substantive consideration of the Plaintiff's hematology-related impairments at those later steps. (*See id.*) These are significant omissions, given that the Plaintiff had argued in his brief that his "non-severe conditions were *not* meaningfully considered as part of the remaining steps[.]" (Pl.'s Memo., at 7) (emphasis in original, quotation marks omitted).

I therefore conclude that the ALJ committed a reversible error at Step Two. In reaching this conclusion, I do not adopt the Plaintiff's counsel's intemperate characterizations of the ALJ's opinion. (*Id.* at 1-7) (alleging, among other things, that the opinion contained "palpable nonsense"). I have no doubt that the ALJ strove to do his level best with a developing medical situation that had not been cited as a basis for disability in the original DIB application – and with an unusually large administrative record, important portions of which had been provided only a

week before the hearing.  (*See* R. 38.)  But the law is clear that an ALJ must have a sufficient basis for concluding that an impairment is non-severe, and an unsupported conclusion of non-severity is not harmless if the ALJ fails to consider the impairment's impacts at later stages of the sequential evaluation process.  *E.g., Rodriguez v. Saul*, No. 19-cv-9066 (JLC), 2021 WL 738348, at *13-14 (S.D.N.Y. Feb. 25, 2021) ("[T]he Court cannot conclude based on the record that the ALJ considered Rodriguez's ankle impairment at any stage in her analysis and, accordingly, remand is warranted on this basis."); *Cintron v. Berryhill*, No. 1:16-cv-7731 (SDA), 2018 WL 1229731, at *10 (S.D.N.Y. Mar. 6, 2018) (remanding where claimant's medically determinable mental impairments, even though non-severe, were not "separately considered in determining [the claimant's] RFC, as [the ALJ] was required to do").  The case should be remanded to correct this error.

### B.    The Plaintiff's Other Claims of Error

As noted above, the Plaintiff makes four other claims of error.  When a Social Security claimant appeals the Commissioner's decision on multiple grounds, and the Court sustains one objection and orders the case remanded, it often does not address the other objections but instead simply instructs or encourages the ALJ to consider them at a rehearing.  *See, e.g., Shackleford v. Saul*, No. 3:19-cv-1278 (TOF), 2020 WL 3888037, at *9 (D. Conn. July 10, 2020) ("On remand, and after further development of the record and a new hearing, the ALJ shall consider the other claims of error not discussed in this decision."); *Pacheco v. Saul*, No. 3:19-cv-987 (WIG), 2020 WL 113702, at *8 (D. Conn. Jan. 10, 2020) ("On remand the Commissioner will address the other claims of error not discussed herein."); *Moreau v. Berryhill*, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at *4 (D. Conn. Mar. 14, 2018) ("Because the court finds that the ALJ fails to develop the record, it also suggests that the ALJ revisit the other issues on remand, without finding it

necessary to reach whether such arguments would themselves constitute legal error justifying remand on their own.").  Considering the unusual size of the administrative record, I will depart from that principle in this case and address some of the Plaintiff's other claims, for the guidance of the parties and the ALJ on remand and for the assistance of the District Judge who reviews this recommended ruling.

### 1.    The ALJ's Treatment of the Opinion Evidence

The Plaintiff second claim of error is an attack on the ALJ's evaluation of the medical opinion evidence.  (Pl.'s Memo., at 7-13.)  That attack has five fronts.  First, the Plaintiff argues that the ALJ should not have relied on the opinions of the state agency reviewers who assessed his physical conditions, as they never "laid eyes on [him], let alone clinically examined him."  (*Id.*, at 9.)  Second, he says that the ALJ mishandled Dr. Patel's opinion; his argument is not a model of clarity, but he evidently believes that the ALJ should have credited the doctor's 2018 statement that he could not lift, push, or pull weights greater than five pounds.  (*Id.*, at 11.)  Third, the Plaintiff notes that the ALJ discussed APRN Mollica's opinion principally in psychological terms, and he contends that the ALJ had "an obligation to develop the [r]ecord by seeking a medical source statement that actually sought information about what she was primarily treating [him] for: his physical impairments."  (*Id.*, at 12.)  Fourth, he argues that the ALJ's comments about the unnamed "safety supervisor" at his former workplace were "absurd."  (*Id.*)  Fifth and finally, he argues that the ALJ mishandled Dr. Talsania's opinion, for the reasons discussed above.  (*Id.*, at 13.)

The Plaintiff's medical record should be updated on remand, and upon rehearing ALJ will no doubt consider any new medical opinions or reconsider any existing ones as necessary to reach a proper decision in view of the updated record.  Nevertheless, some observations can be made, and to frame that discussion it will be useful to restate the applicable legal standards.  In

considering medical opinion evidence, the SSA is no longer required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [the claimant's own] medical sources." 20 C.F.R. § 416.920c(a). The agency must "consider those medical opinions . . . using the factors listed in" 20 C.F.R. § 416.920c(c)(1) through –(c)(5), which include (1) the opinion's supportability, (2) the opinion's consistency "with the evidence from other medical sources and nonmedical sources in the claim," (3) the source's relationship with the claimant, (4) the source's specialization, and (5) "other factors that tend to support or contradict a medical opinion." 20 C.F.R. §§ 416.920c(a), -(c)(1)-(5). Again, the "supportability" analysis considers "the objective medical evidence and supporting explanations presented by a medical source . . . to support his or her medical opinion(s)[.]" 20 C.F.R. § 416.920c(c)(1). The "consistency" analysis considers the opinion's congruence with other evidence in the record. 20 C.F.R. § 416.920c(c)(2). Against this backdrop, the Court will now consider the Plaintiff's first four claims of error in the handling of the opinion evidence, the fifth claim having already been addressed above.

a.    State agency reviewers

The Plaintiff first assails the ALJ's partial reliance on the state agency consultants' reports. (Pl.'s Memo., at 9.) As noted above, the medical portion of the Plaintiff's case was reviewed by Keith Kaplan, M.D. at the initial level, and by Ricardo Ramirez, M.D. at the reconsideration level. (R. 72-87, 102-15.) The ALJ noted that the "most restrictive" of these reviews "found that the claimant was limited to sedentary work, but could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, and never claim ladders ropes and scaffolds and crawl." (R. 24.) He observed that this finding was "consistent with the claimant's medical records that show normal movement of all extremities," and he cited the consultants' "particularized knowledge of the

disability program, which enables them to make judgments with regard to the claimant's symptoms and allegations of disabling limitations." (*Id.*) He nonetheless concluded that the opinion was only "partially persuasive," because it was "not supported by a direct examination of the claimant." (*Id.*) The Plaintiff challenges even this partial reliance, because the two doctors "[n]ever laid eyes on" him. (Pl.'s Memo., at 9.) He also points out that Drs. Kaplan and Ramirez are, respectively, a urologist and an internist, and he argues that "no amount of 'particularized knowledge of the disability program' can make a urologist competent to opine on an individual with orthopedic impairments . . . diabetes and hematological-oncological diseases." (*Id.*, at 9-10.)

To the extent that the Plaintiff's argument is a blanket attack on the use of non-examining state agency consultants, it contradicts established law. "It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (collecting cases); *see also Rosier v. Colvin*, 586 F. App'x. 756, 758 (2d Cir. 2014) (summary order) (substantial evidence supporting ALJ's conclusion that a treating physician's opinion should not be given controlling weight included evaluations by a consultative examiner). Of course, "[c]ourts in this Circuit long have casted doubt on assigning significant weight to the opinions of consultative examiners when those opinions are based solely on a review of the record." *Soto v. Comm'r of Soc. Sec.*, No. 19-cv-4631 (PKC), 2020 WL 5820566, at *7 (E.D.N.Y. Sept. 30, 2020). But if the opinions have proper support in the record, "[a]n ALJ is entitled to rely on the opinions of both examining and non-examining State agency medical consultants, because those consultants are deemed to be qualified experts in the field of social security disability." *Wilson v. Saul*, No. 3:18-cv-01097 (WWE), 2019 WL 2603221, at *11 (D. Conn. June 25, 2019).

Moreover, to the extent that the Plaintiff's argument is a blanket attack on the use of specialists from fields other than the claimant's own treating providers, that argument contradicts established law as well.  Other courts have rejected the argument that a state agency consultant must be a specialist in the treating provider's field before his or her opinion can be relied upon.  In *Lovett v. Berryhill*, for example, the court observed that a consulting physician "need not be" "a specialist in the relevant area of medicine," because "state agency medical consultants are experts in the Social Security disability programs, and in appropriate circumstances, their opinions may be entitled to greater weight than the opinions of treating or examining sources."  No. 3:17-cv-637 (SRU), 2018 WL 4502179, at *8 (D. Conn. Sept. 20, 2018) (quoting SSR-90-6p, 1996 WL 374180, at *2-3) (brackets, ellipses and quotation marks omitted); *see also Peter B. v. Kijakazi*, No. 3:20-cv-966 (TOF), 2022 WL 951689, at *10 (D. Conn. Mar. 30, 2022) (rejecting argument that ALJ could not reasonably rely upon state agency pathologist and pediatrician who opined on gastric issues); *Peltonich v. Colvin*, No. 13-11246-JGD, 2014 WL 4716190, at *11 (D. Mass. Sept. 19, 2014), *aff'd* (1st Cir. Aug. 24, 2015) (rejecting argument that non-examining state agency consultant should not have been relied upon because he was not opining within his specialty).

The Plaintiff is on firmer ground when he complains about the vagueness of the ALJ's discussion of the consultants' opinions.[4]  The ALJ essentially limited that discussion to just one of the two opinions (R. 24) (discussing the one opinion with the "most restrictive functional assessment"), but in his parenthetical citation he cited both, arguably leaving the reader unclear about which one he meant.  (*Id.*) (citing both Exs. 1A and 6A).  And when discussing the opinion's

---

[4]     The Plaintiff lodges this complaint principally in connection with Dr. Patel's opinion. (Pl.'s Memo., at 11 n.20) (arguing that, in referencing two exhibits totaling 484 pages without a pinpoint citation, the ALJ improperly required the parties and the Court "to root through hundreds of pages in the Record to determine what he is referring to").  But a similar complaint could have been made with respect to the ALJ's discussion of the consultants' opinions.

consistency with the Plaintiff's medical records, he cited four exhibits totaling over 1,000 pages, without providing any pinpoint citations. (*Id.*) (citing Exs. 18F, 23F, 25F, and 27F). Courts disfavor lumping multiple medical opinions into a single analysis. *See, e.g., Colon Medina v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 295, 303 (W.D.N.Y. 2018) ("[B]ecause the ALJ assessed these opinions in a collective fashion, it is not clear to the Court which opinions . . . the ALJ discounted based on vagueness, and which opinions were discounted because they were based on Plaintiff's subjective complaints."). They also generally look for the ALJ to provide pinpoint record citations on especially contentious issues. *See, e.g., Beck v. Colvin*, No. 6:13-cv-6014 (MAT), 2014 WL 1837611, at *14 (W.D.N.Y. May 8, 2014).

Yet these deficits do not constitute reversible error in this case, because however imprecise the ALJ's discussion may have been, those imprecisions have not frustrated this Court's review. *Cf. Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (remand is warranted where "inadequacies in the ALJ's analysis frustrate meaningful review"). The Court has been able to determine that, although he cited both Exhibit 1A and Exhibit 6A in his discussion, the ALJ was referencing the latter. (*Compare* R. 24 *with* R. 110.) Moreover, the Court has carefully reviewed the 1,000-plus pages in Exhibits 18F, 23F, 25F, and 27F, and has identified several places in which those exhibits supported the ALJ's consistency analysis. For example, Exhibits 18F and 25F documented normal range of motion in the Plaintiff's neck and back (*e.g.*, R. 1019, 2187, 2331, 2345, 2377); Exhibit 25F confirmed an absence of edema, clubbing, or cyanosis in his extremities (*e.g.*, R. 2377, 2429); and Exhibit 25F also documented a lack of instability in the Plaintiff's knee. (*E.g.*, R. 2197.) In any decision issued after remand and a rehearing, the ALJ is encouraged to use pinpoint record citations, but his failure to do so in this instance does not constitute an additional basis for remand.

b.    Dr. Patel

The Plaintiff next challenges the ALJ's treatment of Dr. Patel's opinion.  (Pl.'s Memo., at 11.)  Dr. Patel is a specialist in interventional physiatry, and he and others in his practice treated the Plaintiff for a work-related back injury on multiple occasions between July 14, 2017 to April 30, 2018.  (R. 381-482.)  After the Plaintiff's penultimate visit, Dr. Patel wrote in an office note that he could return to light duty work but could not lift, push, or pull weights greater than five pounds.  (R. 384.)  The ALJ considered this note as a medical opinion, but he regarded it as "not persuasive" for three reasons: first, because it "was supported only by an examination period prior to the alleged [disability] onset date;" second, because in opining that the Plaintiff could return to light duty work, Dr. Patel "reach[ed] a conclusion reserved for the Commissioner;" and third, because the opinion was "not consistent with the claimant's more recent medical records that show preserved strength."  (R. 22.)  In his brief, the Plaintiff assails the second and third conclusions. (Pl.'s Memo., at 11 & n.21.)

The second conclusion was not reversible error.  "Opinions on some issues . . . are not medical opinions, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." *Grisel A. v. Kijakazi*, No. 3:20-cv-719 (TOF), 2021 WL 4350565, at *7 (D. Conn. Sept. 24, 2021) (quoting 20 C.F.R. § 416.1927(d)). This class of opinions includes opinions that a claimant is or is not disabled, and "[t]he Commissioner is not obliged to give any special significance to the source of such an opinion." *Id.* (quotation omitted).  When Dr. Patel opined that the Plaintiff could return to light duty work (R. 384), he was opining on the ultimate issue of disability – and, by extension, entering an area that is reserved for the Commissioner.  But even if the ALJ erred in failing alternatively to consider the doctor's statement as an "opinion[] concerning the severity of the claimant's condition," as the

26

Plaintiff urges (Pl.'s Memo., at 11 n.21) (citing *LeDonne v. Astrue*, No. 3:08-cv-1525 (PCD), slip op. at 12-14 (D. Conn. Jan. 12, 2010)), it would have been a harmless error.  After all, in the portion of the opinion that the ALJ disregarded on "reserved for the Commissioner" grounds,[5] the doctor said that the Plaintiff *could* work.  (R. 384.)

The Plaintiff's challenge to the ALJ's third conclusion is difficult to understand.  He begins by correctly recounting the ALJ's finding that a five-pound weight restriction was "not consistent with . . . more recent medical records that show preserved strength."  (Pl.'s Memo., at 11.)  But then he says that "as of March 16, 2018," Dr. Patel observed "5/5" strength throughout when tested individually in the lower extremities."  (*Id.*) (citing R. 383).  He apparently contends that the latter statement conflicts with the former, but the Court is at a loss to see how.  Repeated notations of "5/5" strength are indeed inconsistent with a five-pound lifting restriction, as the ALJ correctly observed.  (R. 22.)

To the extent that the Plaintiff is saying that the record was insufficient to find "preserved strength," the Court disagrees.  Dr. Patel documented "5/5" strength on more than one occasion. (*E.g.,* R. 383, 385, 387, 389, 391.)  And the record cited by the ALJ as "show[ing] preserved strength," Exhibit 18F, likewise documented "5/5" strength in different body parts on different occasions.  (*E.g.*, R. 884, 911, 912; *cf. also* R. 1083, 1087 (stating, in a review of endocrine system function, that the Plaintiff had experienced "no generalized decrease in strength").).  To be sure, these references are not numerous, but the Court is unable to conclude that the ALJ lacked a substantial evidentiary basis for discrediting Dr. Patel's opinion.

---

[5]    The Court regards the ALJ's statement that the opinion "reaches a conclusion reserved for the Commissioner" as pertaining only to the statement that the Plaintiff could return to light duty work, not to the statement that he required a five-pound lifting restriction.

Moreover, the Plaintiff does not contend with the ALJ's first conclusion – namely, that the Patel opinion "was supported only by an examination period prior to the alleged [disability] onset date." (R. 22.) An ALJ does not commit legal error when he discounts opinions that predate the relevant period and are inconsistent with the record as a whole. *See Herrington v. Berryhill*, No. 3:18-cv-0315(WIG), 2019 WL 1091385, at *4 (D. Conn. Mar. 8, 2019). In *Herrington*, the court discussed that it was not an error for the ALJ to discount opinions of providers because, in addition to the inconsistency of the opinions in the context of the record as a whole, "[t]he restrictions the . . . providers imposed were well outside of the relevant period, which detracts from their relevance." *Id.* (citing *Harris v. Colvin*, No. 2:14-cv-65 (JMC), 2015 WL 282014, at *6 (D. Vt. Jan. 22, 2015) (discussing that an opinion being rendered outside of the relevant period is "a proper factor for the ALJ to consider").) Here, Dr. Patel opined that the Plaintiff had a five-pound lifting restriction on March 16, 2018 (R. 383), but the claimed disability onset date is June 30, 2018. (R. 12.) On remand, the ALJ will want to consider (or reconsider) the opinion evidence in light of the updated record as necessary, but on the current record the Court is unable to identify any reversible error in his treatment of the Patel opinion.

c.     APRN Mollica

The Plaintiff next attacks the ALJ's handling of APRN Mollica's opinion on two principal grounds. (Pl.'s Memo., at 11-12.) First, he notes that the opinion is dated October 31, 2018, and he suggests that the ALJ was obliged to seek an updated opinion to reflect the changes in his condition over the ensuing two years. (*Id.*) Second, he points out that the opinion – and the ALJ's discussion of it – principally concerned his mental health conditions, and he argues that the ALJ failed in his duty to develop the record when he failed to request an opinion from APRN Mollica

on his physical impairments.  (*Id.* at 12.)  He says that APRN Mollica primarily treated him for physical issues, not mental ones.  (*Id.*)

The record reveals the following facts relevant to this claim.  On October 4, 2018, the SSA sent a questionnaire to the Plaintiff and asked him to bring it to his doctor.  (R. 661.)  The questionnaire was chiefly psychiatric in nature (*see* R. 655-59); for example, it asked the responding doctor to give a brief psychiatric history, to list the Plaintiff's psychiatric medications, and to describe his response to treatment.  (R. 655.)  It also asked for a current mental status, and it asked the doctor to rate the Plaintiff in several areas of mental functioning, including activities of daily living and social interaction.  (R. 656-58.)  Although the Plaintiff now says that APRN Mollica treated him primarily for his physical symptoms, he brought this psychiatric questionnaire to her.  (*See* R. 659.)  APRN Mollica completed the questionnaire on October 31, 2018 (*id.*), and in it, she described the Plaintiff as "well kempt" and alert and oriented.  (R. 656.)  She also rated him "3" or higher on a 1-7 scale in each dimension of mental functioning, meaning that at most he "sometimes" had a problem in those dimensions.  (R. 656-59.)

The ALJ analyzed APRN Mollica's opinion and decided that it was "persuasive."  (R. 22.)  He observed that the "opinion is supported by a direct treating relationship, and the author is a disinterested third party, with ample opportunity to observe the claimant on a regular basis."  (*Id.*)  He also concluded that "the opinion is consistent with the claimant's activities of daily living," and with "the claimant's medical records that show He [sic] had an appropriate appearance and dress, was cooperative, showed normal behavior, and normal speech."  (*Id.*)

The Plaintiff does not challenge the ALJ's treatment of this mental opinion, but he argues that the ALJ was obliged to request a physical one.  (Pl.'s Memo., at 12.)  The Plaintiff is of course correct that, given the non-adversarial nature of benefits proceedings, ALJs have an affirmative

duty to develop a complete and accurate medical record, including opinion evidence from treating providers. "Indeed, the plain text of the regulation does not appear to be conditional or hortatory: it states that the Commissioner 'will request a medical source statement' containing an opinion regarding the claimant's residual capacity." *Tankisi*, 521 F. App'x at 33 (citing 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6)). However, when the record "contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity," *id.* at 34, the failure to obtain medical source opinion evidence is not "per se error." *Sanchez v. Colvin*, No. 13-CIV-6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015); *see also Sinclair v. Saul*, No. 3:18-cv-00656 (RMS), 2019 WL 3284793, at *7 (D. Conn. Jul. 22, 2019) (same). Stated differently, the ALJ's duty to develop the record is not unlimited and may be discharged when he "possesses [the claimant's] complete medical history" and there are no "obvious gaps or inconsistencies" in the record. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted). Applying these principles, courts have found medical source statements unnecessary when the claimant had been examined by a consultative examiner and the underlying record was voluminous and contains detailed medical treatment notes. *See, e.g., Rivera v. Berryhill*, No. 3:16-cv-01842 (JAM), 2018 WL 1521824, at *5 (D. Conn. Mar. 28, 2018) ("Here, the record contains the notes of Dr. Kumar, Nurse Striegel, and the mental health staff at Catholic Charities, which included Dr. Kligfeld. The record also contains the consultative examiners reports . . . as well as the non-consultative examinations from the state agency. There is adequate meat on the bones of this record for the ALJ to have made a determination of plaintiff's RFC that is supported by substantial evidence.").

In this case, the record may well have had enough information to assess the Plaintiff's orthopedic, hepatic, and endocrine conditions even without an additional opinion from APRN

Mollica.  There are over 5,000 pages of medical records, including nearly 100 pages of detailed treatment notes from Dr. Patel about the Plaintiff's back condition (R. 381-481); recent treatment notes from the Plaintiff's endocrinologist (R. 724-44); and hundreds of pages of notes from APRN Mollica herself.  Moreover, the Plaintiff was examined by a consultative examiner.  (R. 759-63.) Dr. Steven Weisman examined him on September 13, 2019, and he concluded (among other things) that the Plaintiff was able to lift and carry ten pounds frequently and was "[a]ble to perform positional and manipulative activity frequently."  (R. 763.)

In view of my recommended disposition of the Step Two issue, I consider it unnecessary to decide this claim of error.  Concluding that the ALJ did or did not have enough information to assess the Plaintiff's orthopedic, hepatic, and endocrine conditions is unnecessary when he did not have enough information on the hematological conditions.  On remand, the ALJ should consider whether to request additional opinions from APRN Mollica.

d.    Safety supervisor

Finally, the ALJ's opinion contains a curious paragraph about a "safety supervisor" at the Plaintiff's prior employer.  (R. 23.)  The Plaintiff formerly worked as a school bus driver for All Star Transportation, and while adjusting one of his workers' compensation claims, All Star's insurer apparently asked the company to complete a questionnaire explaining the physical demands of his job.  (R. 3804.)  An unnamed "safety supervisor" completed the questionnaire and faxed it back to the insurer, and it somehow made its way into the Plaintiff's SSA claim file.  (*Id.*) The ALJ evidently mistook this non-medical statement of what the job required, for a medical statement of what the Plaintiff could do.  (R. 23.)  The Plaintiff says that it was "absurd" for the ALJ to do so, and he wonders how a document "setting forth the exertional requirements of a school bus driver" "could be confused with a physical examination."  (Pl.'s Memo., at 12.)  The

ALJ was indeed mistaken in regarding the safety supervisor's statement as a medical opinion, but the error was harmless because the ALJ entirely disregarded it.  (R. 23) ("[T]his opinion is not persuasive.").  On remand, the ALJ shall give this document no consideration whatsoever as medical opinion.

### 2.    The ALJ's Evaluation of the Plaintiff's Complaints of Pain

In his third claim of error, the Plaintiff argues that the ALJ's evaluation of his chronic pain was "insufficient."  (Pl.'s Memo., at 13-15.)  He charges the ALJ with having "discounted to near zero [his] complaints of chronic, intractable pain."  (*Id.*)  The Commissioner replies that the ALJ properly evaluated the claimant's symptoms including pain.  (Def.'s Mem., at 10.)

The parties' dispute implicates the SSA's two-step process for evaluating a claimant's symptoms.  *See* 20 C.F.R. 416.929(c)(1); *see also* Soc. Sec. R. ("SSR") 16-3P, 2017 WL 5180304, at *3 (S.S.A. Oct. 25, 2017) ("We use a two-step process for evaluating an individual's symptoms.").  In the first step of the process, the ALJ must determine whether the "medical signs or laboratory findings" show that the claimant "has a medically determinable impairment . . . that could reasonably be expected to produce" the claimed symptoms.  *Id.*  If so, the ALJ then proceeds to the second step, at which he evaluates "the intensity and persistence of [the claimant's] symptoms such as pain," and determines the extent to which those symptoms "limit his or her ability to perform work-related activities."  *Id.* at *4; *see also Genier*, 606 F.3d at 49.

In performing the second step, "the ALJ must consider all of the available evidence, including objective medical evidence, from both medical and nonmedical sources."  *Gonzalez v. Berryhill*, No. 3:18-cv-00241 (SRU), 2020 WL 1452610, at *12 (D. Conn. Mar. 25, 2020).  The ALJ "may not reject a claimant's subjective opinion regarding the intensity and persistence" of her symptoms "'solely because the available objective medical evidence does not substantiate . . .

her statements.'" *Id.* (quoting 20 C.F.R. § 416.929(c)(2)) (alteration omitted).  If there is a conflict between the objective evidence and the claimant's testimony, "the ALJ 'must consider the other evidence,'" including "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; (5) treatment, other than medication, received for pain relief; (6) measures taken to relieve pain and other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* (quoting *Graf v. Berryhill*, No. 3:18-cv-00093 (SRU), 2019 WL 1237105, at *8 (D. Conn. Mar. 18, 2019)) (internal quotation marks and alterations omitted); see also 20 C.F.R. § 416.929(c)(3).

Provided that the ALJ follows this process, his conclusions are ordinarily entitled to deference from this Court.  "It is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order) (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).  These findings "are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transp.*, 20 F.3d 658, 661 (5th Cir. 1994)); *see also Gonzalez*, 2020 WL 1452610, at *13 (same).

Should an ALJ choose to discredit the claimant's testimony, however, he "must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence." *Crysler v. Astrue*, 563 F. Supp. 2d 418, 440 (N.D.N.Y. 2008); *see also*

*Thomas v. Comm'r of Soc. Sec. Admin.*, No. 19-cv-1177 (GWG), 2020 WL 4757059, at \*8 (S.D.N.Y. Aug. 18, 2020) (citing *Williams*, 859 F.2d at 260-61) (holding that "the basis for the finding must be . . . set forth with sufficient specificity to permit intelligible plenary review of the record") (internal quotation marks omitted). "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3P, 2017 WL 5180304, at \*9 (S.S.A. Oct. 25, 2017).

With respect to the Plaintiff's credibility, "[w]hen determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account." *Genier*, 606 F.3d at 49. However, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Williams v. Berryhill*, No. 3:17-cv-01235 (VLB), 2018 WL 4380983, at \*11 (D. Conn. Sept. 14, 2018) (citing *Genier*, 606 F.3d at 49). "In light of substantial evidence in the record supporting the ALJ's credibility determination, the court may not second-guess his decision. This applies with particular force in light of the special deference owed to the credibility determinations of an ALJ who had the opportunity to observe plaintiff's demeanor while testifying." *Id.* (citing *Marquez v. Colvin*, No. 12 CIV. 6819 PKC, 2013 WL 5568718, at \*16 (S.D.N.Y. Oct. 9, 2013) (internal citation omitted)).

Here, the ALJ followed the process set forth in the regulations. In the first step, he considered whether the Plaintiff's medically determinable impairments could reasonably be expected to produce the claimed symptoms, and he concluded that they could. (R. 20.) He then proceeded to the second step, evaluating the intensity and persistence of the Plaintiff's symptoms

and the degree to which they limited his ability to perform work-related activities. As directed by the regulations, he began the second step by considering the objective medical evidence. With respect to the Plaintiff's "back and lower extremity pain," he noted "diagnostic imaging show[ing] minor degenerative disk changes," "normal movement of all extremities," "unremarkable" repetitive motion testing," and a normal gait. (R. 20.) And with respect to the Plaintiff's Osgood Schlatter disease, he noted both the good and the bad; while "diagnostic imaging showed medial compartment narrowing with mild subchondral sclerosis," "physical examinations also showed normal movement," "no edema, clubbing or cyanosis," and full range of motion in the knee. (R. 20-21.)

The ALJ did not stop with this analysis of the objective evidence. As required when the objective evidence conflicts with the claimant's testimony, *see* 20 C.F.R. § 416.929(c), he went on to consider other evidence, including the Plaintiff's activities of daily living, measures taken to relieve the pain, and "other factors concerning [his] functional limitations." With respect to activities of daily living, he noted that the Plaintiff takes care of all his personal needs such as cooking, laundry, and dishes; attends hockey games several times each month; and operates a recreational vehicle. (R. 24.) He addressed pain relief measures by noting the degree to which the Plaintiff's back pain had improved with chiropractic care and epidural steroid injections. (R. 20.) And he addressed "other factors concerning . . . functional limitations" when he pointed out that the Plaintiff sometimes bicycles and swims. (R. 24.)

While the ALJ has yet to properly evaluate the Plaintiff's claims of disabling anemia-induced fatigue (*see* discussion, Section IV.A *supra*), he followed the correct process with respect to the Plaintiff's complaints of pain. Another analysis will likely be required after the new hearing, but the Court is unable to say that the existing analysis violated the regulations. "Because the ALJ

specifically addressed the Plaintiff's subjective complaints in accordance with the regulations, he

'was entitled to make a credibility determination regarding the Plaintiff's allegations.'" *Dayle B.*

*v. Saul*, No. 3:20-cv-359 (TOF), 2021 WL 1660702, at *24 (D. Conn. Apr. 28, 2021) (quoting

*Jordan v. Barnhart*, 29 F. App'x 90, 794 (2d Cir. 2002) (summary order)).  Even where "there is

evidence in the record that could point to a different conclusion," "'credibility findings of an ALJ

are entitled to great deference and therefore can be reversed only if they are patently

unreasonable.'"  *Id.* (quoting *Pietrunti*, 119 F.3d at 1042).

### 3.    The ALJ's Step Five Findings

The Plaintiff next challenges the ALJ's Step Five findings.  (Pl.'s Memo., at 15-21.)  At that

step, "the Commissioner must determine that significant numbers of jobs exist in the national

economy that the plaintiff can perform."  *McIntyre*, 758 F.3d at 151.  "An ALJ may make this

determination either by applying the Medical Vocational Guidelines or by adducing testimony of

a vocational expert."  *Id.*  If the ALJ chooses the latter route, he "may rely on a vocational expert's

testimony regarding a hypothetical as long as there is substantial record evidence to support the

assumption upon which the vocational expert based his opinion."  *Id.* (internal quotation and

citation omitted).  Although disability claimants bear the burden of proof at Steps One through

Four, "at step five, the burden shifts to the Commissioner to demonstrate that there is other work

that the claimant can perform, based on the claimant's RFC, age, education, and past relevant

work."  *Torres v. Colvin*, No. 3:16-cv-809 (JAM), 2017 WL 1734020, at *2 (D. Conn. May 3,

2017) (citing *McIntyre*, 758 F.3d at 150).

In this case, the ALJ concluded that "jobs . . . exist in significant numbers in the national

economy" that could be performed by a person of the Plaintiff's "age, education, work experience,

and residual functional capacity."  (R. 25.)  In reaching this conclusion, he relied on the testimony

of a VE, Raymond Cestar.  (R. 26.)  Cestar has been a vocational expert for nearly forty years, and

he was a Social Security disability claims examiner for ten years before that.  (Curriculum Vitae

of R. Cestar, R. 336.)  He holds a graduate certificate in forensic vocational rehabilitation from

Minnesota State University – Mankato (*id.*), and at the hearing, the Plaintiff's counsel objected to

his qualifications.  (R. 63.)  Citing the Dictionary of Occupational Titles ("DOT") and his own

"knowledge, training, and experience," Cestar opined that there were 34,000 jobs in the national

economy that the Plaintiff could perform[6] – 19,000 "document preparer" jobs, 11,000 "paper press

cutter" jobs, and 4,000 "surveillance system monitor" jobs.  (R. 65, 67.)  He then answered every

question that the Plaintiff's attorney asked him.  (R. 67-70.)  Counsel did not ask him any questions

about his job incidence numbers or the sources from which he derived them.  (*Id.*)

The Plaintiff nonetheless attacks the ALJ's Step Five findings on appeal to this Court.  He

raises three principal arguments.  First, he contends that Cestar's job incidence numbers were

facially unreliable because they were premised on job titles that have become obsolete in the

modern economy.  (Pl.'s Memo., at 15-17.)  Second, he argues that it was error for the ALJ not to

require Cestar "to specify the sources he . . . used to come up with national job incidence

testimony."  (*Id.*, at 17-18.)  Third, he says that the ALJ's hypothetical question to Cestar was

defective because it assumed capabilities that were unsupported by the record.  (*Id.*, at 18-21.)

---

[6]    In his appeal to this Court, the Plaintiff does not argue that 34,000 jobs is an insignificant
number.  While "[t]here is no formal definition in the Social Security Act of what a 'significant'
number of jobs is," "courts have generally held that what constitutes a 'significant' number is fairly
minimal, and numbers . . . between 9,000 and 10,000 jobs nationally . . . have typically been found
to be sufficiently significant to meet the Commissioner's burden."  *Dayle B.*, 2021 WL 1660702,
at *24 (quoting *Sanchez v. Berryhill*, 336 F. Supp. 3d 174, 177 (W.D.N.Y. 2018)) (brackets
omitted)).

With respect to the first argument, the Plaintiff notes that the DOT describes a "paper press cutter" as someone who "tears or cuts out marked articles or advertisements from newspapers and magazines, using knife or scissors," and he asserts that it "defies common sense and experience" to conclude that there are 11,000 such jobs in the 21st century economy. (*Id.* at 17.) He cites *Zacharopoulos v. Saul* for the proposition that "national job incidence testimony" about the DOT's "document preparer" position is particularly unreliable. (*Id.* at 16) (citing 516 F. Supp. 3d 211, 220-25 (E.D.N.Y. 2021)) (brackets omitted). And he notes that the DOT describes a "surveillance system monitor" as someone who "[m]onitors premises of public transportation terminals to detect crimes or disturbances," and he says that Cestar must have been talking about a different job when he opined that there were 4,000 such positions in the national economy. (*Id.* at 17 & n.39.)

Courts have rejected similar challenges under analogous circumstances. In *Bavaro v. Astrue*, for example, a VE testified that a significant number of "photo counter clerk" jobs existed in the national economy, but the claimant regarded the testimony as facially unreliable considering "the decline of the photofinishing industry." 413 F. App'x 382, 384 (2d Cir. 2011) (summary order). The Second Circuit "decline[d] Bavaro's invitation to take judicial notice of" that decline, holding instead that where "[a] vocational expert testified to the existence of such jobs at the national and regional level," the ALJ was "entitled to credit that testimony" – at least where the claimant offered only "conclusory proclamations to the contrary." *Id.* (citing 20 C.F.R. § 404.1566(e)). Similarly, in *Wilson v. Saul* a VE identified a significant number of jobs that the claimant could do, and she stated that "her testimony was consistent with the [DOT]." No. 3:18-cv-1097 (WWE), 2019 WL 2603221, at *13 (D. Conn. June 25, 2019). On appeal to the District Court, the claimant urged reversal on the ground that those jobs were unavailable in the modern economy, but Judge Eginton disagreed. *Id.* Noting that "Plaintiff's counsel was present at the

hearing and had a full opportunity to cross-examine the VE and explore the limitations of the DOT methodology, including the number of jobs existing in the national economy," he held that "[t]he ALJ did not err in crediting the testimony of the VE on the number of jobs existing in the national economy for each occupation." *Id.* And in *Duprey v. Berryhill*, a VE testified that there were 120,000 "addresser" jobs available, but the claimant asserted that this was an "impossibility." No. 3:17-cv-607 (SALM), 2018 WL 1871451, at *11 (D. Conn. Apr. 19, 2018). Judge Merriam nevertheless declined to reverse on this ground, because "[t]he VE submitted his credentials, testified that his responses were consistent with the DOT, and answered all of the plaintiff's attorney's questions." *Id.* at *12. Under those circumstances, "the ALJ reasonably relied on the VE's expertise." *Id.*

To be sure, some courts have been disconcerted by the growing obsolescence of certain DOT titles. In the case cited by the Plaintiff, for example, the court analyzed the DOT's "document preparer" title and observed that it contemplated "microfilming," "rubber stamp[ing]," and other obsolete technologies. *Zacharopoulos*, 516 F. Supp. 3d at 221-22. The court "express[ed] dissatisfaction about the Commissioner's reliance on vocational expert testimony predicated on plainly obsolete positions." *Id.* at 223-24 (citing cases). Yet however dated it may be, the fact remains that administrative notice of the DOT is still expressly authorized by the Social Security regulations. 20 C.F.R. § 416.966(d)(1). Moreover, it is still the case that claimants ordinarily cannot obtain reversal or remand with mere "conclusory proclamations" about the seeming obsolescence of the job titles upon which the VE relied. *Bavaro*, 413 F. App'x at 384.

The Plaintiff raises a somewhat different attack on the "surveillance system monitor" position, but this attack is no more meritorious. During the hearing, his counsel asked Cestar "where . . . that job is generally performed these days," and Cestar responded, "[i]n offices." (R.

69.)  On appeal, the Plaintiff notes that the DOT describes a "surveillance system monitor" not as someone who monitors office buildings' surveillance systems generally, but rather as someone who "[m]onitors premises *of public transportation terminals*" specifically, using "closed circuit television monitors."  (Pl.'s Memo., at 17 & n.39) (citing DOT § 379.367-010) (emphasis added).  He therefore suggests that Cestar defined the job differently than the DOT does – and if that were the case, the ALJ would have been obliged to "elicit a reasonable explanation for the conflict before relying on the VE."  *Steven N. v. Berryhill*, No. 1:17-cv-427, 2018 WL 6629681, at *14 (W.D.N.Y. Dec. 19, 2018) (quoting SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000)).  But it is unclear whether the testimony truly conflicted with the DOT, because as the Commissioner points out, "[i]t appears that the [VE] was explaining the setting where the surveillance system monitor works, and not the environment that the worker is watching via video."  (Def.'s Memo., 13.)  Moreover, even if it had been error to rely on the VE's testimony about the surveillance system monitor position, that error would have been harmless, because "[t]he Commissioner need show only one job existing in the national economy that [the claimant] can perform."  *Bavaro*, 413 F. App'x at 384 (citing 42 U.S.C. § 423(d)(2)(A) and 20 C.F.R. § 404.1566(b)).  Here, the ALJ cited two other jobs aside from the surveillance system monitor position.  For this reason and all the other foregoing reasons, I recommend that the Plaintiff's first challenge to the ALJ's Step Five conclusions be rejected.

The Plaintiff's second assault on the Step Five findings is a claim that the ALJ erred in not requiring Cestar to disclose the sources of his job incidence data.  (Pl.'s Memo., at 17-18.)  The Plaintiff does not claim to have asked Cestar for that data at the hearing, nor does he claim that Cestar refused to answer any of his questions.  (*See id.*)  His argument is more legal than factual, and it begins with the observation that a reviewing court must examine "the entirety of a VE's

40

testimony, including the expert's methods, to make sure it rose to the level of 'substantial' evidence." (*Id.*, at 17-18 (citing *Brault*, 683 F. 3d at 450).) He then suggests that this obligation necessarily implies a duty to ensure that the ALJ inquired about the VE's sources, even if his own counsel did not. (*Id.* at 18.)

The Plaintiff's proposed categorical rule is in tension with the Supreme Court's recent decision in *Biestek v. Berryhill*, 139 S.Ct. 1148 (2019), and with the subsequent District of Connecticut cases applying it. In *Biestek*, the Supreme Court declined an invitation to create a categorical rule forbidding reliance on VE testimony whenever the VE refuses a request for underlying job data. *Id.* at 1157. The court observed that even when a VE refuses such a request, his testimony sometimes "still will clear (even handily so) the more-than-a-mere-scintilla threshold." *Id.* In *Crespo v. Commissioner of Social Security*, Judge Meyer applied *Biestek* to a case in which the VE had not refused to provide the source of her job incidence numbers – she simply had not been asked. No. 3:18-cv-00435 (JAM), 2019 WL 4686763, at *8 (D. Conn. Sept. 25, 2019). The judge observed that "[i]f the substantial evidence requirement does not categorically require a vocational expert to disclose her job-numbers data, even when specifically requested, neither does it require a vocational expert to disclose the general source of her jobs-number data in the absence of any request." *Id.*, at *9; *accord Stonick v. Saul*, No. 3:19-cv-1334 (TOF), 2020 WL 6129339, at *18 (D. Conn. Oct. 19, 2020).

Following *Biestek*, courts in this district therefore apply a case-by-case, rather than a categorical, approach to these sorts of Step Five challenges. But other cases have had fact patterns like this one, and accordingly they provide guidance. In *Keovilay v. Berryhill*, as here, the VE testified that his testimony was consistent with the DOT. *Compare* R. 65-66 *with* No. 3:19-cv-735 (RAR), 2020 WL 3989567, at *9 (D. Conn. July 15, 2020). And here, as in *Keovilay* and *Crespo*,

the plaintiff neither challenged the VE's qualifications nor asked him about the sources of his job incidence data.  *Compare* R. 67-70 *with* 2020 WL 3989567, at *8 and 2019 WL 4686763, at *8. In both *Keovilay* and *Crespo*, the court concluded that the absence of source data for the VE's job incidence numbers did not "dispel the existence of substantial evidence."  2020 WL 3989567, at *9; 2019 WL 4686763, at *8; *but see Donna S. v. Kijakazi*, No. 3:20-cv-1404 (KAD), slip op. at 9-10 (D. Conn. Jan. 28, 2022).  While the Plaintiff's second challenge to the ALJ's Step Five findings arguably does not need to be decided – because his counsel will likely ask any rehearing VE for the source data underlying his job incidence numbers – in light of these precedents I am unable to say on the current record that the ALJ's failure to request that data *sua sponte* constitutes an additional basis for remand.

In his third challenge to the Step Five findings, the Plaintiff asserts that the ALJ's hypotheticals were defective.  (Pl.'s Memo., at 18-21.)  He cites several reasons, but it is sufficient to note that in crafting those hypotheticals, the ALJ took no account of anemia-induced fatigue. (*See* discussion, Section IV.A *supra.*)  On remand, the ALJ shall consider this impairment at all steps of the evaluation process.

### 4.    The ALJ's Appointment

Finally, the Plaintiff argues that the ALJ was not constitutionally appointed.  (Pl.'s Memo., at 21-22.)  In his brief, he devotes only a page's worth of text to this argument, but the Court can discern his theory from the lone case that he cites in support of it.  (*Id.*) (citing *Brian T.D. v. Kijakazi*, 580 F. Supp. 3d 615 (D. Minn. 2022), *appeal docketed*, No. 22-1601 (8th Cir. Mar. 22, 2022)).  The argument begins with the U.S. Constitution's Appointments Clause, Art. II, § 2, cl. 2, which provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States."  The clause adds that "Congress may

by law vest the Appointment of such inferior Officers, as they may think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

The argument then proceeds through the Supreme Court's June 21, 2018 decision in *Lucia v. Securities & Exchange Commission*, 138 S.Ct. 2044 (2018). The SEC had charged Lucia with violations of the Investment Advisors Act, and SEC ALJ Cameron Elliot heard his case. *Id.* at 2049-50. Judge Elliot had not been appointed by "the President . . . the Courts of Law, or . . . the Heads of Departments," but rather by lower-ranking SEC staff members. *Id.* at 2050. After Lucia lost his case at the administrative level, he appealed on the ground that Judge Cameron had not been constitutionally appointed. *Id.* at 2049. The Supreme Court ultimately agreed, holding that "administrative law judges . . . of the Securities and Exchange Commission . . . qualify as" Officers of the United States for Appointments Clause purposes.

SSA ALJs also had not been appointed by a "Head of Department," but rather by lower-level staff members. The *Lucia* decision therefore cast a shadow over their constitutional status. In response, on July 16, 2018, then-Acting Commissioner of Social Security Nancy Berryhill "ratified the appointments of [the SSA's] ALJs and approved those appointments as her own." Soc. Sec. Ruling 19-1p, 84 Fed. Reg. 9582-02, 9583 (Mar. 15, 2019). Berryhill considered this action sufficient "[t]o address any Appointments Clause questions involving Social Security claims." *Id.*

The problem, according to the Plaintiff and the *Brian T.D.* court, is that Berryhill herself was not validly serving when she purported to ratify the appointments. The Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 *et seq.* ("FVRA"), limits the amount of time that a person can serve as an "acting officer," and the *Brian T.D.* court held that Berryhill had surpassed that limit when she issued the purported ratification. *Brian T.D.*, 580 F. Supp. 3d at 630. It therefore held that the

ALJ whose appointment she had "ratified" was not properly empowered to hear the case. *Id.* In this case, the Plaintiff contends that the ALJ suffered from the same statutory and constitutional infirmity. (*See* Pl.'s Memo., at 22.)

To address this argument, it will first be necessary to review the timeline of Berryhill's tenure. Berryhill formerly served as the SSA's Deputy Commissioner of Operations ("DCO"), third in command under then-Commissioner Michael Astrue. *Id.* at 620. Astrue resigned on February 13, 2013, and his second in command, Deputy Commissioner Carolyn Colvin, became Acting Commissioner. *Id.* Colvin then resigned on January 21, 2017, and with the Commissioner and Deputy Commissioner positions both vacant, the Acting Commissionership passed to Berryhill under the agency's succession rules. *Id.*

Under the FVRA, Berryhill's Acting Commissionership lapsed on November 16, 2017. *Id.* at 621. She then returned to the DCO position. *Id.* But when President Trump nominated Andrew Saul to be Commissioner, Berryhill resumed serving as Acting Commissioner. Thus, Berryhill served (or purported to serve, in the Plaintiff's view) in the Acting Commissioner role twice – once from January 21, 2017 to November 16, 2017, and again from the time of Saul's nomination on April 17, 2018 to his final Senate confirmation on June 17, 2019. *Id.* Her ratification of the ALJ appointments occurred during the second term.

The FVRA prescribes time limits for acting service. 5 U.S.C. § 3346. There are two limitations on time. First, an acting commissioner can serve for a maximum of "210 days beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). Second, "once a first or second nomination for the office is submitted to the Senate," the acting officer may serve "from the date of such nomination for the period that the nomination is pending in the Senate." 5 U.S.C. § 3346(a)(2).

In *Brian T.D.*, the parties offered differing interpretations of this statute. The plaintiff contended that once Berryhill used up the 210 days that were available to her under Section 3346(a)(1) – as she inarguably did in her first, 2017 term – she could not serve the second, 2018-2019 term under Section 3346(a)(2). *Brian T.D.*, 580 F. Supp. 3d at 627. The Commissioner countered that, because Sections 3346(a)(1) and 3346(a)(2) are separated by the word "or," the statute "establishes alternative periods of permissible service." *Id.* Thus, in the Commissioner's view, Berryhill could validly serve in 2017 under Section 3346(a)(1), and then return to service in 2018-2019 under Section 3346(a)(2) while Saul's nomination was pending. *Id.*

The *Brian T.D.* court sided with the plaintiff. *Id.* at 635-36. Noting that Section 3346(a) uses the present-tense term "serving," rather than the past-tense "served" or "has served," the court held that "the section applies to the person presently serving" as an acting officer and "not to a person who had previously served as Acting Commissioner." *Id.* at 629. The court then observed that, "[w]hen Saul was first nominated to become Commissioner on April 17, 2018, Berryhill was not then serving as Acting Commissioner." *Id.* It then concluded that, "by its plain language, § 3346(a)(2) does not apply to Berryhill because she was not serving as Acting Commissioner when Saul was nominated." *Id.*; *accord Richard J.M. v. Kijakazi*, No. 19-cv-827 (KMM), 2022 WL 959914, at *1 (D. Minn. Mar. 30, 2022).

The *Brian T.D.* decision has been heavily criticized and little followed, and a recent case from the Southern District of New York explains why. *Hernandez v. Comm'r of Soc. Sec.*, No. 21-cv-10658 (VB) (JCM), 2022 WL 18402121, at *12 (S.D.N.Y. Dec. 16, 2022). Noting that the dispute presented an issue of statutory interpretation, the *Hernandez* court began "'where all such inquiries must begin: with the language of the statute itself.'" *Id.* (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012)). Under established principles of statutory

interpretation, the use of the word "or" between Sections 3346(a)(1) and 3346(a)(2) ordinarily "'indicat[es] that they have separate meanings." *Id.* (quoting *Loughrin v. United States*, 573 U.S. 351, 359 (2014)). "Moreover, distinct factual predicates give rise to each of the periods of service and the allowable periods of service differ." *Id.* Whereas service under Section 3346(a)(1) begins on the date the vacancy occurs and is capped at 210 days, service under Section 3346(a)2) starts on the date of a nomination and continues while the nomination is pending. *Id.* In the *Hernandez* court's view, the two sections plainly create "two separate (though not mutually exclusive) periods of service." *Id.*

The court also addressed *Brian T.D.'s* focus on the statute's use of the present-tense term "serving." *Id.* at *13. Noting that Section 3346(a) does not stop at "serving as an acting officer," but instead goes on to say "serving as an acting officer *as described under section* 3345," the court concluded that "[t]he purpose of this clause . . . is to make plain that the time limitations imposed apply to those serving under Section 3345, and not some other vacancy statute or provision." *Id.* (citing S. Rep. No. 105-250, at 14-15 (1998)). "The clause is thus meant to indicate who the time limits that follow apply to within a specific statutory framework, not to place the additional temporal limitation that *Brian T.D.* advances." *Id.*

Perhaps most persuasively, the *Hernandez* court pointed out that "the *Brian T.D.* court's reading leads to an illogical result." *Id.* "If the Court accepts as true that an individual must be presently serving in order for both provisions (a)(1) and (a)(2) to apply, then an acting officer would have to be presently serving 'beginning on the date the vacancy occurs' in order to start the initial 210-day period." *Id.* (quoting 5 U.S.C. § 3346(a)(1)). "As other courts addressing this issue have aptly noted, 'this makes no sense.'" *Id.* (quoting *Bauer v. Kijakazi*, No. 21-cv-2008 (KEM), 2022 WL 2918917, at *5 (N.D. Iowa July 25, 2022)). In the words of yet another court, "[t]here

cannot be a vacancy and a 'person serving as an acting officer' at the same time." *Sidney M. v. Kijakazi*, No. C21-cv-2034 (LTS), 2022 WL 4482859, at *16 (N.D. Iowa Sept. 26, 2022).

I agree with the *Hernandez* analysis, and accordingly I recommend that the Plaintiff's fifth and final claim of error be rejected. "As the Supreme Court has cautioned, 'interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.'" *United States v. Messina*, 806 F.3d 55, 70 (2d Cir. 2015) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)). The *Hernandez* court persuasively explained why the *Brian T.D.* analysis produces an absurd result, and why the Commissioner's interpretation of the statute is consistent with its legislative purpose. *Hernandez*, 2022 WL 18402121, at *13 (explaining that the purpose of the disputed statutory provision is "to make plain that the time limitations imposed apply to those serving under Section 3345, and not some other vacancy statute or provision"). Moreover, the *Hernandez* result "is consistent with the vast weight of authority" across the country. *Id.* at *15 (citing cases). "[T]he vast majority of courts to address this issue have declined to adopt *Brian T.D.'s* reasoning and have instead held that the plaint text of the FVRA indicates that Section 3346(a)(2) operates as a 'spring-back' provision that allowed Berryhill to resume service upon Saul's nomination in 2018." *Id.* (citing cases).

In summary, I recommend that the Court hold that the ALJ was constitutionally appointed. Acting Commissioner Berryhill was validly serving when she ratified and approved the appointments of SSA ALJs, including the ALJ in this case, on July 16, 2018.

## V.    CONCLUSION

In closing, I address the Plaintiff's claim for a reversal and remand solely for calculation of benefits. (Pl.'s Memo., at 23.) To award that form of relief, a district court must find that, irrespective of the legal error, the record contains "persuasive proof" of the claimant's disability

and "a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626

F.2d 225, 235 (2d Cir. 1980).  A record contains "persuasive proof" of disability when there is "no

apparent basis to conclude" that additional evidence "might support the Commissioner's decision."

*Rosa*, 168 F.3d at 83.  That is not the case here; among other reasons, much remains unknown

about the Plaintiffs' hematological conditions and their vocational impact, including whether the

conditions that emerged in late 2020 "lasted or can be expected to last for a continuous period of

not less than [twelve] months.'"  *Smith*, 740 F. App'x at 722 (quoting 20 C.F.R. § 404.1505(a)).

Put another way, this is a case in which the record is just as "insufficient to *find* disability as well

as to *deny* it."  *Trasielyn A. v. Kijakazi*, No. 21-cv-253 (TOF), 2022 WL 4129343, at *7 (D. Conn.

Sept. 12, 2022).

     For the reasons stated above, I recommend that the District Judge: (1) grant the Plaintiff's

Motion to Reverse the Decision of the Commissioner (ECF No. 14) to the extent that it seeks

vacation of the Commissioner's decision and remand for further administrative proceedings; (2)

deny the Plaintiff's Motion to Reverse the Decision of the Commissioner to the extent that it seeks

an order reversing and remanding solely for an award and calculation of benefits; (3) deny the

Commissioner's Motion to Affirm the Decision (ECF No. 19); and (4) order that the case be

remanded to the Commissioner for further proceedings consistent with this opinion.

     This is a recommended ruling by a magistrate judge.  *See* Fed. R. Civ. P. 72(b)(1).  Any

objections to this recommended ruling must be filed with the Clerk of the Court within fourteen

(14) days of being served with this order.  *See* Fed. R. Civ. P. 72(b)(2).  Failure to object within

fourteen (14) days will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and

6(e) of the Federal Rules of Civil Procedure; D. Conn. L. Civ. R. 72.2; *Impala v. United States

Dep't of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection

to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam).

*/s/ Thomas O. Farrish*
_____
Hon. Thomas O. Farrish
United States Magistrate Judge
